# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ABDUL R. CHAUDRY, Individually and on Behalf of All Others Similarly Situated, | No. |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| MICROSOFT CORPORATION, STEVEN A. BALLMER, PETER S. KLEIN, FRANK H. BROD and TAMI RELLER, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Abdul R. Chaudry ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Microsoft Corporation ("Microsoft" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of purchasers of Microsoft common stock between April 18, 2013 and July 18, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant Microsoft is the world's largest software company, primarily as a result of its near-monopoly Windows personal computer ("PC") operating system software and its Microsoft Office collection of productivity programs. In addition, the Company produces a

wide range of software for desktop computers and servers and is active in Internet search with its Bing search engine; the video game market with its Xbox and Xbox 360 products; the digital services market with its Microsoft Network, or MSN; and in mobile phones via its Windows Phone operating system.

3.      In June 2012, Microsoft announced that it would be entering the PC vendor market for the first time with the launch of its Microsoft Surface tablet computer. Several months later, on October 26, 2012, the Company launched its first tablet product, the Surface RT. The general availability of Surface RT and Microsoft's new Windows 8 operating system started on October 26, 2012. On February 9, 2013, Microsoft released its second, more expensive tablet, the Surface Pro.

4.      Prior to the beginning of the Class Period, Defendants led the market to believe that Microsoft's launch of Surface RT had been executed in a measured and conservative fashion so that it could observe and understand its progress and outcome. What Defendants knew, but failed to disclose to investors, however, was that Microsoft's foray into the tablet market was an unmitigated disaster, which left it with a large accumulation of excess, over-valued Surface RT inventory.

5.      Surface RT's commercial failing has been due, in large part, to the limitations associated with its operating system, Windows RT.

6.      Windows RT, a variant of Microsoft's new Windows 8 operating system, is an operating system that has been designed for use on tablets and similar mobile devices that utilizes ARM architecture, or RISC-based computer processors. While Microsoft intended for Windows RT devices to take advantage of the longer battery life and thinner hardware designs associated with ARM architecture, the devices that run Windows RT, including Microsoft's

2

Surface RT tablet, lack certain software functionality in that the devices can only run pre-installed apps or apps that are available via Microsoft's Windows Store.

7.       Primarily as a result of this limitation, and concerns with software compatibility, Windows RT devices received unfavorable user reviews and have been largely disregarded by consumers.

8.       By the first quarter of 2013, just months after being released to the public, retailers of Windows RT tablets began to slash the prices of their devices in an attempt to generate consumer demand and clear unsold stock from stores.

9.       Unbeknownst to investors, by the end of its March 31, 2013 quarter, Microsoft had amassed a large excess of Surface RT inventory. In violation of the Company's publicly disclosed inventory accounting policy, generally accepted accounting principles ("GAAP") and SEC rules and regulations, Defendants caused Microsoft to issue materially false and misleading financial statements and financial disclosures for the quarter ended March 31, 2013. These false and misleading statements materially misrepresented the true financial effect that Surface RT was then having on the Company's operations.

10.      Defendants' materially false and misleading conduct enabled Microsoft to forestall Surface RT's day of reckoning and delay what would be tantamount to an admission by the Company that its all-important entry into the tablet market had been a failure.

11.      Saddled with bloated inventory of unwanted Surface RT tablets, Defendants, in the Spring of 2013, hopelessly tried to spur market demand. First, Microsoft gave consumers a free magnetic cover that doubles as a keyboard – a deal that amounted to a $100.00 discount off the combined $600.00 price tag for the cover and Surface RT. Later, Microsoft slashed the price

of the Surface RT tablet by 30%. Neither of these initiatives generated meaningful sales of Surface RT.

12.    Then, on July 18, 2013, Microsoft issued a press release announcing that its financial results for the quarter ended June 30, 2013 had been adversely impacted by a $900 million charge related to a write-down in the value of its Surface RT inventory. In truth, however, the value of such inventory was materially impaired by March 31, 2013.

13.    On this news, Microsoft common stock suffered its biggest price decline in more than four years, plunging $4.04 per share, or 11.4%, on very heavy trading volume to close at $31.40 per share. The magnitude of the decline in the price of Microsoft's stock eviscerated about $34 billion of the Company's market value.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

16.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

17.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ stock market, an electronic securities exchange located in this District.

4

## PARTIES

18.     Plaintiff as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Microsoft during the Class Period and has been damaged thereby.

19.     Defendant Microsoft was founded in 1975 and is the world's largest software company. The Company maintains its executive offices in Redmond, Washington and develops, manufactures, licenses, and supports a wide range of computer related products and services. Defendant Microsoft has a June 30 year end.

20.     Defendant Steven A. Ballmer ("Ballmer") served, at all relevant times, as Microsoft's Chief Executive Officer and is a member of the Company's Board of Directors.

21.     Defendant Peter S. Klein ("Klein") served as Microsoft's Chief Financial Officer ("CFO") until he resigned from the Company on May 7, 2013.

22.     Defendant Frank H. Brod ("Brod") served, at all relevant times, as Microsoft's Corporate Vice President and its Chief Accounting Officer. Defendant Brod signed the Company's Form 10-Q that was filed with the SEC during the Class Period.

23.     Defendant Tami Reller ("Reller") served as the Chief Marketing Officer and CFO of Microsoft's Windows Division until July 11, 2013, when she was named as Executive Vice President of the Company's Marketing group.

24.     Defendants Ballmer, Klein, Brod and Reller are collectively referred to herein as the "Individual Defendants."

25.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Microsoft, were privy to confidential and proprietary information concerning Microsoft, its operations, finances, financial condition and present and future business prospects.

5

The Individual Defendants also had access to material adverse non-public information concerning Microsoft, as discussed in detail below. Because of their positions with Microsoft, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Microsoft's business.

27.     The Individual Defendants, because of The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

6

28.     The Individual Defendants, as senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, governed by the federal securities laws and is registered with the NASDAQ stock market, had a duty to promptly disseminate accurate and truthful information with respect to Microsoft's operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Microsoft common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Microsoft common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Microsoft's business, operations and management and the intrinsic value of Microsoft common stock; and (ii) caused Plaintiff and members of the Class to purchase Microsoft common stock at artificially inflated prices

**CLASS ACTION ALLEGATIONS**

30.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Microsoft between April 18, 2013 and July 18, 2013, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Microsoft common stock was actively traded on the NASDAQ stock market. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Microsoft or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Microsoft;

(c)     whether the price of Microsoft common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

35.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

36.     Defendant Microsoft, the world's largest software company, operates via five primary business segments: Windows & Windows Live Division ("Windows Division"), Server and Tools, Online Services Division, Microsoft Business Division, and Entertainment and Devices Division. The Windows Division develops and markets PC operating systems, related software and online services, and PC hardware products, including the Surface RT.

37.     On October 26, 2012, Microsoft launched its first tablet-focused operating system, Windows RT. Microsoft designed the Windows RT operating system for ARM-powered tablets manufactured by third parties, as well as for its own Surface RT device.

38.     While Windows RT was touted as the first version of Windows written to run on low-power ARM-based processors, its limited functionality stunted market demand, primarily due to its non-compatibility with software written for PCs, its capability of operating only app-based programs and the limited number of Windows RT software apps.

39.     Just weeks after being released, it became apparent to Defendants, who purportedly were closely monitoring the launch of Surface RT, that Windows RT was failing to

gain any significant market acceptance. For example, on January 15, 2013, PCWorld reported, in

an article entitled "Why Windows RT is hurtling toward disaster," that "Windows RT is all but

dead in the water right now" and that third party tablet manufacturers were shunning Windows

RT due to poor market demand. The article stated, in pertinent part, as follows:

> Windows RT actually started CES [the January 2013 International Consumer
> Electronics Show] with a bang: When Microsoft CEO Steve Ballmer bounded
> onstage during Qualcomm's opening night keynote, he showed off two Windows
> RT tablets. One was the Samsung ATIV Tab, and Ballmer lauded Samsung as one
> of Microsoft's key hardware partners.
>
> But just three days later, Samsung told CNET that it won't be bringing the ATIV
> Tab stateside, citing poor demand for Windows RT tablets in general.
>
> *       *       *
>
> Samsung isn't the only OEM [original equipment manufacturer] to retreat from
> Windows RT. Both HP and Toshiba squashed plans for a Windows RT tablet
> before the operating system even hit the streets, while Acer announced that its
> own Windows RT tablet won't appear before the second quarter of this year, if it
> comes out at all.
>
> At this point the Dell XPS 10, Asus VivoTab, and Lenovo Yoga 11 are the only
> Windows RT devices available aside from Microsoft's own Surface RT. And all
> of them have landed with a thud, Surface arguably -very arguably -aside.

40.     Not unlike other Windows RT based tablets, Defendants knew or recklessly

ignored that consumer demand for Microsoft's Surface RT tablet was also soft.

41.     On February 1, 2013, InfoWorld reported, in an article entitled "No Microsoft

didn't sell 90,000 Surface RT tablets," that while Microsoft was mum on Surface RT sales,

analysts, when attempting to determine the number of devices sold, learned that the device had a

"very high" customer return rate; found little evidence of continued Surface RT production; and

speculated that half a million Surface RT devices were sitting unsold in warehouses, stating, in

pertinent part, as follows:[1]

> Best as I can tell, Microsoft has been completely mum on Surface RT sales, both officially and off the record. More than that, not one single retailer has spilled the beans on Surface RT sales.
>
> Here's what we know.
>
> Yesterday IDC [International Data Corporation] issued a press release that estimated Microsoft had shipped "just shy of 900,000 units into the channel" during the fourth quarter. That's where the 900,000 number originated. IDC was quite cautious and very precise in not saying that those units were sold -- in any sense of the term.
>
> Two days ago, Cnet quoted iSuppli analyst Rhoda Alexander as saying Microsoft shipped about 1.25 million units into the channel, but sales "were significantly lower, maybe on the order of 55 to 60 percent of that figure" -- leading to an estimate of, say, 690,000 to 750,000 tablets sold. Alexander goes on to say that she's seen "little evidence of continued production of the Microsoft RT device," and calls the Surface RT return rate "very high."
>
>            *     *     *
>
> Of course, we have no figures at all about returns. But the iSuppli numbers suggest that more than half a million Surface RT machines are sitting in warehouses, unsold, gathering dust. In addition, an unknown number have been -- or will be -- returned, over and above that half-million. No wonder Microsoft isn't making any more of them (if the rumors are true).

42.     While the investment community speculated that Microsoft was sitting on a half

million unsold Surface RT devices, in reality, the Company was saddled with millions of Surface

RT units that, at its then current $500 price point, were generally unsalable. As a result,

Defendants knew or recklessly ignored, that the market value of Microsoft's Surface RT

inventory had declined precipitously and that the Company, pursuant to applicable accounting

rules, was required to write-down the value of its Surface RT inventory during the quarter ended

March 31, 2013.

---

[1] Emphasis is added unless otherwise noted herein.

43.     Moreover, the general market conditions for competing Windows RT tablets provided further evidence to Defendants that the value of Microsoft's Surface RT inventory was materially impaired and that the Company was required to write down the value of such inventory during the quarter ended March 31, 2013.

44.     For example, during the March 31, 2013 quarter, third party manufactures of Windows RT based tablets drastically slashed the prices of their products in an attempt to clear unsold inventory, and Samsung all but discontinued its Windows RT tablet offering.

45.     In addition, on April 2, 2013, just days after the March 31, 2013 quarter end, Computerworld reported, in an article entitled "Prices of Windows RT tablets drop, point to failure of OS"; the article stating, in pertinent part, that:

> Prices of Windows RT devices have started falling, signaling an attempt by PC makers to quickly clear out stock after poor adoption of tablets and convertibles with the operating system.

> Microsoft released Windows RT for ARM-based devices and Windows 8 for Intel-based devices in October last year. The price drop is an acknowledgement that Windows RT has failed, analysts said.

46.     The Computerworld article also noted that Asus' VivoTab RT tablet was being sold on Amazon at more than 35% off its $599.00 launch price, while Newegg listed the tablet as being discontinued. Similarly Lenovo was reported as selling its Windows RT based tablet at 25% off its original price.

47.     A few weeks later, Microsoft tried to sell Surface RT tablets by giving consumers, free of charge, a $100.00 magnetic cover for the Surface RT device. On July 15, 2013, the Company announced that it cut the price of the Surface RT by $150.00, or 30%.

48.     Then, on July 18, 2013, Microsoft issued a press release announcing that its financial results for the quarter ended June 30, 2013 had been adversely impacted by a $900

12

million charge related to Surface RT "inventory adjustments." The massive $900 write-down was necessary to remove the artificial inflation from the value of the Company's unsold Surface RT inventory.

49.     Microsoft's CFO, Amy Hood, partly attributed the reduction in the value of Microsoft's inventory of Surface RT tablets as being due to the $150.00 price cut that the Company announced just days prior. In truth, however, the value of the Company's Surface RT inventory was materially impaired by the end of its March 31, 2013 quarter.

50.     Thereafter, on July 26, 2013, The Verge reported, in an article entitled "Ballmer admits Microsoft built too many Surface RTs, disappointed with Windows sales," that Defendant Ballmer admitted that the Company built too many Surface RT tablets. The article stated in pertinent part, as follows:

> "We built a few more devices than we could sell," admitted Ballmer when referring to the slow Surface RT sales. Microsoft recently cut the price of its Surface RT tablets by 30 percent worldwide, and Ballmer and [Microsoft Chief Operating Officer] Turner reiterated in the internal meeting that the huge writedown was a price adjustment that was necessary to sell Surface RT devices.

Pre-Class Period Statements

51.     On February 13, 2013, Defendant Klein spoke at Goldman Sachs' Technology & Internet Conference. Defendant Klein explained that Microsoft executed a "very controlled launch" on the Surface RT tablet so that it could observe and understand its progress and outcome, stating, in pertinent part, as follows:

> I think with Surface RT, there is a couple things that we really learned and part of it stems from our approach. ***As you know, we had a very controlled launch and part of the reason for that is so we could really observe and sort of understand the experience launching a new product, new operating system, new architecture, our own device.*** So that was limited to our stores and our online and

some limited geographies. And one of the things that we learned from that is that people really need to touch and see and play with it to really understand. There is a lot we did to build awareness, but observing people coming into the stores and seeing it and playing with is super important and so what we have done is to broaden the reach of what we are doing on distribution, get it out there in more geographies, in third-party retail so people can actually come in, touch it and play with it and really get the full experience so that they really understand that. And so we are going to take that and now broaden that and of course, with the recent introduction of Pro, we will start with a little bit more expanded distribution and continue to expand capacity.

I think the other thing that we have learned because RT was a new type of operating system and a new architecture is seeing how people use it and taking that learning to actually continuing to update and make updates to the operating system, which was part of the design principle to begin with because those benefits benefit the whole ecosystem. So the learning from Surface helped -- when we see software and hardware integrated very closely, it helps us really understand some of the core experiences. We can build that back into the operating system over time and then that benefits the whole ecosystem as well.

So we learned a lot about distribution, we learned a lot about the need for people to experience it. We learned a lot about how to continually make the operating system better.

52.    Defendant Klein discussed Microsoft's hardware strategy and noted that the

Company's tablet product line was "additive" and that its strategy allowed it "to build a nice

little business," stating, in pertinent part, as follows:

And, and when you say hardware, I assume you are talking more on the tablet and PC side more than the gaming side. *I think of it as more additive than anything else*. As technology evolves and as innovation happens, the ability to work closely between the boundaries of software and hardware allows us to innovate in ways that we couldn't before and as I said before, that innovation benefits the whole ecosystem and so our ability to deliver some unique experiences in hardware I think is very interesting. It shows what the full power in certain scenarios of what a Windows 8 can do, but it also benefits the whole ecosystem.

And so I understand that that is a balancing act and in fact, the ecosystem has always been about balance, but there is amazing work going on across the whole ecosystem that I think is benefiting from a lot of the things that we are all doing to think about how we bring Windows 8 to market and what kinds of experiences that you will see. And I think over time -- remember, it is very early in Windows 8. I think over time, you will start to be very impressed by what is emerging broadly from the ecosystem across form factors and sizes.

So as the market has evolved, it has gotten more diverse. The set of experiences have changed and I think the whole ecosystem is evolving with that and I think we play a part in that and ***the hardware strategy allows us to build a nice little business***. But most importantly, it benefits the whole ecosystem.

53.    These representations by Defendant Klein remained alive and uncorrected during the Class Period.

## Materially False and Misleading Statements
## Made During the Class Period

54.    The Class Period begins on April 18, 2013. On that day, Microsoft issued a press release announcing the financial results for its fiscal 2013 third quarter, the period ended March 31, 2013. For the quarter, the Company reported revenue of $20.49 billion and net income $6.06 billion, or $0.72 per diluted share.

55.    Defendants commented on the results, stating, in pertinent part, as follows:

Defendant Ballmer:

The bold bets we made on cloud services are paying off as people increasingly choose Microsoft services including Office 365, Windows Azure, Xbox LIVE, and Skype. While there is still work to do, we are optimistic that the bets we've made on Windows devices position us well for the long-term.

Defendant Klein:

Our diverse business continues to deliver solid financial results, even as we navigate the evolving device market. Looking ahead, we will continue to invest in long-term growth opportunities to drive our devices and services strategy forward and deliver ongoing value to shareholders.

56.    The press release announced a 23% year-over-year increase in revenue in the Company's Windows Division, due in part to Microsoft's Surface devices, stating, in pertinent part, as follows:

The Windows Division posted revenue of $5.70 billion, a 23% increase from the prior year period. Adjusting for the recognition of revenue related to the Windows

Upgrade Offer, Windows Division non-GAAP revenue was flat. During the quarter, we added to the Surface family of devices with Surface Pro.

57.     In addition, Microsoft announced that Defendant Klein informed Microsoft of his intention to resign as CFO and leave the Company on June 30, 2013.

58.     Following the Company's 2013 third quarter earnings announcement, Microsoft held a conference call with analysts and investors to discuss the Company's earnings and operations. Prior to the conference call, Microsoft issued the following earnings call slide indicating that the Company's Windows Division's non-original equipment manufacturer (Non-OEM) revenue grew 40% for the quarter, driven by sales of its Surface products:



59.     During the conference call, Chris Suh, Microsoft's General Manager of Investor Relations, reiterated that, even though the revenue of the Company's Windows Division was flat during the quarter, Non-OEM revenue grew 40%, driven by sales of its Surface devices, stating, in pertinent part, as follows:

> In the Windows division, revenue was flat this quarter. Within that, OEM revenue performance was in line with the underlying PC market, which continues to be challenged as the PC market evolves beyond the traditional PC to touch and mobile devices. This quarter, inventory levels were drawn down as the channel awaits new Windows 8 devices. Non-OEM revenue grew 40% this quarter, driven by sales of Surface and continued double-digit growth in volume licensing.

60.     In addition, Defendant Klein noted that for Microsoft's fiscal 2013 fourth quarter ended June 30, 2013, its Windows Division's revenue will "similar to this quarter, . . . continue to reflect sales of Surface," stating, in pertinent part, as follows:

> For the remainder of the call, I will discuss our expectations for the fourth quarter and share some thoughts on fiscal year 2014. Let me start with the fourth quarter. In the Windows division, similar to this quarter, revenue will continue to reflect sales of Surface and strong volume licensing, while OEM revenue will be impacted by the declining traditional PC market as we work to increase our share in tablets.

61.     Then, during the Q&A, session of the conference call when asked whether Surface was proceeding as expected, Defendant Klein gave no hint of any sales or demand related issues. To the contrary, Defendant Klein noted the Company was expanding the distribution of Surface products, stating, in pertinent part, as follows:

> Phillip Winslow, Analyst - Credit Suisse:
>
> You provided a little bit of color on Surface. Obviously we're seeing an expanding portfolio there. I just want to get a sense of how this is evolving especially on the distribution side, and how the product is doing versus your expectations.
>
> And then when you start to think about going forward, how would you also expect the product portfolio to evolve as well as distribution?
>
> Defendant Klein:
>
> Great questions. As I said, we are expanding both the products and distribution. And that is broadly all devices inclusive of Surface. We are expanding distribution of Surface, we're now in 22 countries, 70 retailers. And we'll continue to look to expand that, not only just expanding but improving the experience.
>
> And that's true not just for Surface, but for broadly Windows 8 devices. And so we'll be investing against that for both Surface and a broader array of Windows 8 devices at multiple price points, including lower price points going forward.

62.     That same day, April 18, 2013, Microsoft filed with the SEC its Form 10-Q, signed by Defendant Brod, for the quarter ended March 31, 2013 (the "2013 Q3 Form 10-Q").

The 2013 Q3 Form 10-Q contained materially false and misleading financial statements and materially false and misleading representations about Microsoft's management's discussion and analysis, inventories, internal and disclosure controls and Defendants Ballmer's and Klein's certifications thereon, stating, in pertinent part, as follows:

> Windows Division revenue increased, due mainly to the recognition of $1.1 billion of revenue related to the Windows Upgrade Offer. Revenue from Surface and increased commercial sales of Windows was offset by the impact on revenue of a decline in the x86 PC market. OEM revenue grew 17%, reflecting the revenue related to the Windows Upgrade Offer, offset in part by the impact on revenue of a decline in the x86 PC market.

*     *     *

NOTE 7 — INVENTORIES

The components of inventories were as follows:

(In millions)

|  | March 31, 2013 | June 30, 2012 |
|---|---|---|
| Raw materials | $ 802 | $ 210 |
| Work in process | 11 | 56 |
| Finished goods | 1,320 | 831 |
| Total | $ 2,133 | $ 1,137 |

*     *     *

> Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as required by Exchange Act Rule 13a-15(b) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective. There were no changes in our internal control over financial reporting during the three months ended March 31, 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*     *     *

I, [Defendants Ballmer and Klein], certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Microsoft Corporation;

18

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely

to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

63.     On May 8, 2013, the Company announced that Amy Hood, the former Microsoft Business Division CFO, had been appointed to serve as Microsoft's CFO.

64.     On May 14, 2013, Defendant Reller spoke at JP Morgan's Global Technology, Media and Telecom Conference at the Westin Boston Waterfront Hotel in Boston, Massachusetts. During the conference, Defendant Reller made positive statements about Surface, stating, in pertinent part, as follows:

So far, with Windows 8, we've sold more than 100 million licenses, and of course, Microsoft's Surface. We are expanding our line of hardware into more geographies -- now in 29 markets. And, of course, the launch of Surface Pro recently has also been a very popular product with our customers.

65.     Then, during the Q&A session of the conference call, Defendant Reller noted that Surface was experiencing "really strong momentum in China," and that Microsoft found a "very high satisfaction rat[e] with Surface" and "we know that customers love the Surface product," stating, in pertinent part, as follows:

Defendant Reller:

You know, our Surface is a good example. I mean, we've had some really strong momentum in China. And the launch of Surface Pro, which was very recent, was also warmly received in China. So that has been terrific to see -- you know, not that China always defines what the rest of the emerging markets might see, but I think it is a good indication of just the type of success that we can have, and our partners can have, with Windows touch and Windows tablets in all markets across the globe.

John DiFucci, Analyst – JPMorgan:

Okay. Great. I'm going to skip around a little bit, because you just mentioned Surface. And I guess if you are anticipating a new Surface coming at some point,

is there anything, even generally, that we can expect out of Surface? Surface has come out with the first CRT version and then Windows in the Pro version. And there has been mixed reviews. It's interesting -- I was with a client yesterday, and they just said, "This is absolutely a fantastic price." It was an RT device. But I've gotten the opposite response too. What are the areas -- what are the, I guess, characteristics of Surface that you would look to improve upon in the next version?

Defendant Reller:

I think there's a couple things. One is, you know, I think the characterization you described with the customer you talked to yesterday does represent what we are finding. Our deep customer satisfaction surveys on the product show that there is very high satisfaction ratings with Surface. That's true on Surface Pro, that's true on Surface RT.

On the software itself, we've done so much to improve Windows RT since the introduction of Surface back in the fall. And you see that in just the continuous updates to the system. And certainly, that applies to the number of apps coming into the store. The quality of the first party apps we've done, significant updates to mail, significant updates to just about every other first party app on the device. That makes a difference. The overall performance of the system, including just firmware updates we can make where the battery life improves, just through the great continuous product improvements coming down through Windows Update. And so I think that's made such a positive difference for Surface RT customers as well as all Windows 8 customers.

So we know that customers love the Surface product. It's been interesting to see, with the introduction of Surface Pro, we've also -- we also – we knew this was the case, which is, customers wanted to be able to see both products, to look at both of them, and determine sort of which Surface was going to be right for them. That certainly is a dynamic we've seen in markets where we have both products. So far, we only have Surface Pro in a few markets, but that's quickly expanding throughout the month of May and into June. And so we know that will make a difference for customers to be able to see, evaluate, and then buy the product that is right for them, whether it's Surface RT or Surface Pro.

66.     Defendants' statements referenced above in ¶¶54-65 were each materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company's Surface RT product was experiencing poor customer demand and lackluster sales;

21

(b)     that the Company's Surface RT inventory experienced a material decline in value during the quarter ended March 31, 2013;

(c)     that the Company had accumulated a large excess of known, but undisclosed, overvalued Surface RT inventory as of March 31, 2013;

(d)     that the Company's financial statements for the quarter ended March 31, 2013 were materially false and misleading by violating GAAP and Microsoft's publicly disclosed policy of accounting for inventories;

(e)     that the Company's 2013 Q3 Form 10-Q failed to disclose then presently known trends, events or uncertainties associated with the Surface RT product that were reasonably likely to have a material effect on Microsoft's future operating results;

(f)     that, as a result of (a) - (e) above, Defendants lacked a reasonable basis for their positive statements about the Company's Surface RT product during the Class Period;

(g)     that the Company's disclosure controls and its internal controls over financial reporting were materially deficient and its representations concerning them during the Class Period were materially false and misleading; and

(h)     that the certifications issued by Defendants Ballmer and Klein associated with the Company's disclosure controls and its internal controls over financial reporting were materially false and misleading.

67.     On July 18, 2013, Microsoft issued a press release announcing the financial results for its fiscal 2013 fourth quarter and year end, the periods ended June 30, 2013. For the quarter, the Company reported revenue of $19.9 billion and net income of $4.97 billion, or $0.59 per share. The Company's results for the quarter were adversely impacted by a $900 million inventory charge, or an amount equal to $.07 per share, related to Surface RT "inventory adjustments."

68.     Following the Company's 2013 fiscal fourth quarter and year-end earnings announcement, Microsoft held a conference call with analysts and investors to discuss the Company's earnings and operations. On the call, the Company's CFO, Amy Hood, partly attributed the inventory charge to the $150 Surface RT price cut, stating, in pertinent part, "[w]e reduced the price of Surface RT by $150 to $349 per device. As a result of this price change, as

well as inventory adjustments for related parts and accessories, we recorded a $900 million charge to our income statement."

69.    On this news, Microsoft common stock suffered its biggest price decline in more than four years, plunging $4.04 per share, or 11.4%, on very heavy trading volume to close at $31.40 per share.

70.    The business and financial press later reported that "the poor results shocked Wall Street" and dismayed analysts, euphemistically calling the results "much more disruptive than investors expected."

71.    Jay Yarow of the Business Insider reported that, according to a telephone conversation with Chris Suh, Microsoft's General Manager of Investor Relations, the Company's inventory charge "reflects the new market value of the Surface RTs that are in Microsoft's inventory."

72.    That same day, July 18, 2013, the International Business Times reported that according to IDC, Microsoft only shipped 900,000 of its Surface tablets during the first months of 2013 and that the Surface RT inventory charge "would suggest that Microsoft has a store of six million unsold Surface tablets."

73.    After the market digested this news, Microsoft lost about $34 billion in market value.

74.    The market for Microsoft common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Microsoft common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased Microsoft common stock relying upon the

integrity of the market price of Microsoft common stock and market information relating to Microsoft, and have been damaged thereby.

75.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Microsoft common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

76.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Microsoft's business, products and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Microsoft and its business, products and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

77.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period

were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Microsoft, their control over, and/or receipt and/or modification of Microsoft's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

78.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

79.     The Individual Defendants, because of their positions with Microsoft, controlled the contents of the Company's public statements during the Class Period. Each Individual Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of these Defendants is responsible for the accuracy of Microsoft's corporate statements and are, therefore, responsible and liable for the representations contained therein.

80.     The scienter of the Defendants is underscored by the Sarbanes-Oxley mandated certifications of Defendants Ballmer and Klein, which acknowledged their responsibility to

investors for establishing and maintaining controls to ensure that material information about Microsoft was made known to them and that the Company's disclosure-related controls were operating effectively.

81.     Defendants were further motivated to engage in this fraudulent course of conduct in order to allow the Company additional time to try to sell off its bloated Surface RT inventory before admitting that its pilot tablet device was a commercial failure.

**LOSS CAUSATION**

82.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Microsoft common stock and operated as a fraud or deceit on Class Period purchasers of Microsoft common stock by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Microsoft common stock declined significantly as the prior artificial inflation came out of the Company's common stock price.

83.     As a result of their purchases of Microsoft common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Microsoft common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $36.43 per share on July 16, 2013.

84.     By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Microsoft's business, products and operations. When the truth about the Company was revealed to the market, the price of Microsoft common stock fell significantly. This decline removed the inflation from the price of Microsoft common stock,

causing real economic loss to investors who had purchased Microsoft common stock during the Class Period.

85.     The decline in the price of Microsoft common stock after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Microsoft common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

86.     The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Microsoft common stock and the subsequent significant decline in the value of Microsoft common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

87.     At all relevant times, the market for Microsoft common stock was an efficient market for the following reasons, among others:

(a)     Microsoft common stock met the requirements for listing, and was listed and actively traded on the NASDAQ stock market, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Microsoft filed periodic public reports with the SEC and the NASDAQ stock market;

(c)     Microsoft regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      (d)    Microsoft was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

88.    As a result of the foregoing, the market for Microsoft common stock promptly digested current information regarding Microsoft from all publicly available sources and reflected such information in the prices of the common stock. Under these circumstances, all purchasers of Microsoft common stock during the Class Period suffered similar injury through their purchase of Microsoft common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

89.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

28

and/or approved by an executive officer of Microsoft who knew that those statements were false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

90.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

91.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

93.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Microsoft common stock. Plaintiff and the Class would not have purchased Microsoft common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

94.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Microsoft common stock during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

95.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

96.     The Individual Defendants acted as controlling persons of Microsoft within the meaning of §20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Microsoft, and their ownership of Microsoft common stock, the Individual Defendants had the power and authority to cause Microsoft to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:   September 12, 2013

By his attorneys,

**/s/ Adam M. Stewart**
Edward F. Haber (BBO# 215620)
Adam M. Stewart (BBO# 661090)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA  02109
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
astewart@shulaw.com

Jeremy A. Lieberman
Lesley F. Portnoy
POMERANTZ GROSSMAN HUFFORD
       DAHLSTROM & GROSS, LLP
600 Third Avenue, 20th Floor
New York, New York  10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

Patrick V. Dahlstrom
POMERANTZ GROSSMAN HUFFORD
  DAHLSTROM & GROSS, LLP
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

31

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, ABDUL  R  CHAUDHRY , make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Microsoft Corporation ("Microsoft" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Microsoft securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Microsoft securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Microsoft securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed _____ 03 SEPTEMBER 2013 _____
                  **(Date)**

_____
        **(Signature)**

_____ ABDUL   R   CHAUDHRY _____
        **(Type or Print Name)**

# Exhibit A

**MICROSOFT CORP (MSFT)**                                          **Chaudhry, Abdul**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 04/11/2013 | PUR | 1,000 | $29.0000 |
| 04/16/2013 | PUR | 1,000 | $28.8800 |
| 04/16/2013 | PUR | 1,000 | $28.9100 |
| 04/16/2013 | SLD | 1,000 | $28.9900 |
| 04/16/2013 | SLD | 1,000 | $28.9400 |
| 04/16/2013 | SLD | 1,000 | $29.0900 |
| 04/25/2013 | PUR | 1,000 | $31.9000 |
| 04/25/2013 | SLD | 1,000 | $31.9610 |
| 05/02/2013 | PUR | 1,000 | $32.5000 |
| 05/02/2013 | SLD | 1,000 | $32.6000 |
| 05/03/2013 | PUR | 1,000 | $33.1500 |
| 05/03/2013 | SLD | 1,000 | $33.2900 |
| 05/07/2013 | PUR | 1,000 | $33.3000 |
| 05/07/2013 | PUR | 700 | $33.5200 |
| 05/07/2013 | PUR | 300 | $33.5100 |
| 05/07/2013 | PUR | 1,000 | $33.5094 |
| 05/08/2013 | PUR | 1,000 | $33.0000 |
| 05/22/2013 | PUR | 1,000 | $34.3800 |
| 05/22/2013 | PUR | 1,000 | $34.7000 |
| 05/22/2013 | SLD | 1,000 | $34.4506 |
| 06/24/2013 | PUR | 1,000 | $32.7000 |
| 06/24/2013 | SLD | 1,000 | $33.0900 |
| 06/24/2013 | SLD | 1,000 | $33.6900 |